Okay, the next case is number 2010-1510, BARD PERIPHERAL VASCULAR, Inc., Dr. Goldfarb, against WL Gore and Associates. Mr. Taranto. Thank you, Judge Newman. I hope to make four points today, if there's time. But before getting to specifics, let me summarize them. First, if one doesn't confuse the inurement standard with the joint inventorship standard, or misfocus on post-invention work, all claims here are invalid. Second, if one doesn't incorrectly treat anticipation enablement as requiring more than skilled artisans' ability to make the claimed product, all claims are anticipated by Matsumoto. Third, if one doesn't conflate the written description standard with the patentable distinctness standard, which is essentially an obviousness standard, then all claims except 25 and 26 are invalid under 112. And finally, if one adheres to the right skilled artisan perspective in judging what the Volder article teaches, the same claims are invalid for obviousness. I'd like to begin with joint inventorship, because the facts we rely on not only are uncontroverted, but in fact come right from this Court's Cooper opinions, which explain what Cooper did to contribute to Goldfarb's July 73 conception and reduction to practice of this invention, not to later refinements. The question now is whether that contribution cleared the threshold of being significant, which is a legal question, as the Vanderbilt case confirms. The common-sense answer is that Cooper's contribution to Goldfarb's July 73 conception and reduction to practice was significant. Cooper's year-long technical efforts were central to developing the thing implanted by Goldfarb and then examined to arrive at his invention. And in claims that are to the thing implanted, not to techniques of implanting, Cooper's contribution was significant. The facts, I think, are really quite simple. In November of 72, after a year of graph development work, Cooper undertook a three-structure experiment. But, Mr. Taranto, isn't that really after the conception and reduction of practice? No, no, Your Honor. The Cooper decisions, the interference decisions, find a simultaneous conception and reduction to practice by Goldfarb in July of 73. I'm talking about everything that leads up to that. So, eight months earlier, November of 72, Cooper, having already spent a year with doctors refining various graphs, decides to engage in a three-structure experiment. Fine structure, coarse structure, and a kind of medium structure. He sends those graphs out to various doctors. In February, he begins to get results. And that same, really the same week, he and his colleague Mendenhall at Gore contact Goldfarb and for the first time introduce Dr. Goldfarb to EPTFE material, which he had never heard of. Then, in April of 73, with new results, particularly the results from Dr. Sharp, coming in on the three-structure experiment, the new results showing the coarse, which is to say the longer resistant, Dettin, make four, precisely four, six-inch graphs, sends them to Dr. Goldfarb with a letter that says, these are the most promising ones yet. Expecting them to be suitable as vascular graphs, he asks Dr. Goldfarb to implant them. All of this is straight out of the Cooper I and Cooper II opinions. Dr. Goldfarb then takes one of those six-inch graphs, cuts a slice, implants it in the dog, and six weeks later harvests it, examines it under a slide, recognizes the internodal distance. All of that establishes, and again all directly from the Cooper I and Cooper II opinions, that Dr. Goldfarb's conception and reduction to practice, by July of 73, on a single graph provided to him by Cooper in the April 73 letter, which is an embodiment of the invention, that Cooper's contribution refining the graphs to arrive at that embodiment significantly contributed to Dr. Goldfarb's conception and reduction to practice, a simultaneous conception and reduction to practice when examining the slides after examining the 273RF graph. Dr. Goldfarb didn't change the graph. He didn't use it for a different purpose from the one Cooper sent it to him for. Cooper requested that Dr. Goldfarb implant the graph. Was there any evidence that Cooper communicated this conception to Dr. Goldfarb? No, there wasn't. If he had, we wouldn't have been here because we'd have the patent. The critical thing is that there is a legal difference between the sole inventorship standard or, in the particular situation, the inurement standard, the inurement standard which required Cooper to have in his mind some notion about fibro length, which is the same thing as internodal distance. He didn't have to recognize that what he was sending had it, but the reason Cooper lost on inurement is that he didn't have in his head a notion of internodal distance. That's not the joint inventorship standard. Joint inventorship is properly awarded whenever there is any significant contribution to the one who conceives and reduces to practice. But doesn't there have to be some collaboration? Oh yes, there was plenty of collaboration. But that collaboration requires some communication of these notions of fibro length or distance. It requires, as the Eli Lilly decision said, an open line of communication, but it doesn't require communication of the full invention. There was obviously an open line of communication. Cooper sent Dr. Goldfarb, first, some material in February, second, some material in April. In fact, the material that embodies the invention plus two research reports. The letter itself says, I'm going to continue communicating with you as new research comes in. Dr. Goldfarb, at appendix page 9377, says when Denton, who had just come to work for Cooper in February or March, was now the go-between, and every and forth, and taking the results back. Collaboration is not, I think, a serious issue here. The question is simply whether the objective work that Cooper actually did, which I've just described, before the July 73 invention was a significant contribution to that. And I think it's right to say that Bard has no evidence contrary to any of that. None of the other Barge Cooper ever once denies any of those documented contributions. All of Bard's evidence is, in fact, about post-invention activity. Remember, what happened was Goldfarb gets the reduction to practice of a single dog. Most of his experiments failed. He doesn't have anything that can reliably work in humans, which is the object. It's not required by the claims, but it's the object. So, with Gore, they create a 64-graft experiment after the invention here, after July of 73. Remember, that is the date that Goldfarb got awarded this invention. And they then undertake a year's worth of refinement activity to create what Cooper called an ideal structure, a structure that would actually be useful in humans. That work was necessary to arrive at something well beyond what the claim requires. But that's not the question for joint inventorship. The question for joint inventorship is, what did Cooper do to get Goldfarb to the July 73 stage? Was this all argued in the interference proceedings? No. No, it wasn't. Joint inventorship was not decided in the interference. Why wasn't it argued? Because at least under, I think, what was called the old interference standard, questions of validity were not to be decided by the board. There was a little bit of invalidity determination by the examiner at the initiation stage, though not joint inventorship. Joint inventorship was not part of that. But that piece of it, the initial examiner decision, was not reviewable by the board, and the board said so. So there is no question of preclusion or anything like that. BARD made a motion for preclusion of a limited sort in the district court. The district court denied that motion, I think at 2578 of the appendix, and BARD has not appealed that. Mr. Taranto, I don't mean to cut you off, but your time is short, and I do want to hear from you on the Matsumoto. Okay. I'm happy to get to it. I think I have two points on Matsumoto. The first is that the evidence leaves it undisputed that an internodal distance within the claims is actually disclosed in Matsumoto by picture. That's enough, because there's nothing else missing. In particular, I want to- Yes. It's just a little snapshot of a little piece, at least so your adversaries will argue. One, that's all you can put in a picture where you need lots of magnification. Second, the testimony is- You could have, though, some evidence that that was representative of a standard that was consistent throughout, and there is no such evidence, right? No, that's wrong. We had such evidence, and they had no contrary evidence. In particular, our Dr. Wheeler said, when I read a referee journal with a doctor describing some device, I understand that to be representative of the whole device. Dr. Anderson, their expert, when he listed what he thought was missing from Matsumoto, did not list that, in particular at the transcript page 3089. He said something like, well, that's just a case report, as though that had anything to do with whether it was, in fact, a 102 publication. It was clearly a 102 publication. Isn't there a mission by Cooper that even after the publications of Matsumoto and Volger, it was not obvious for the invention itself to develop? If I can focus- Is there a mission or record to that effect? Well, if I can focus specifically on the question of anticipation and Matsumoto, there was a bunch of evidence that Bard said went to the question of whether Matsumoto was an enabling anticipation, and I think that the right thing to say about that is that all of that evidence has nothing to do with the correct legal standard. The correct legal standard for 102 enablement is, could somebody make what Matsumoto showed? Not was there a chain of custody problem where Gore couldn't actually trace the particular material, the particular batch, the particular lot, the particular extrusion. That's just a chain of custody problem. There was absolutely no evidence that anybody tried and failed to make what Matsumoto showed. There was evidence that people couldn't achieve the 100% success. There was evidence that a lot of work was needed after July 73 to create a working draft, but the whole- You're arguing that the evidence, whatever evidence is there, relates to efficacy, which is not a consideration in the enablement question as to prior art. Exactly. Under GLEEVE and IMPACTS and EOA, all those decisions say enablement for anticipation, for prior art, does not require utility or efficacy. The only question is, could you make? And the patent, their patent, answers that question because their patent says, you give me the specifications, it's well known how to make it. But isn't part of the question, the making question, the question of whether anyone was able to make a consistent or uniform or standard or some reasonably uniform product that would produce the successful result desired? No. The language that Bard introduces now to talk about that is this idea that the draft had to be repeatedly successful. Not in the claims, not in the claim construction, and the whole reason that there had to be undertaken after the July 73 invention, a year's worth of experiments by the Arizona Art Institute under Dr. Goldfarb and others, is that the invention in July 73 was not repeatedly successful. He had more failures than successes. The question is whether the claimed invention could have been made, and that does not require repeatable success, which is nowhere in the claims and nowhere in the claim construction. I think I have. Okay. We'll save you rebuttal time, Mr. Toronto. Anything else you need to ask at the moment? Okay. Thank you. Mr. Tierney. And please, the Court. Each of the questions that Mr. Toronto raises are basically factual questions that the jury looked at and decided against Gore after weighing the evidence, after a very long trial. But we were told that the idea of joint invention was not really present throughout. What's your view? The joint inventorship issue was actually hotly at issue at the case, and part of the problem with Mr. Toronto's discussion is that he gets the story wrong. So what we have to do is take a look at the story and the evidence in support of the jury's verdict that Gore had not met its burden by clear and convincing evidence of showing that there was joint inventorship. What happened was is that after a number of years of failures of being able to make an EPTFE vasculograph, Gore approached Dr. Goldfarb in February, and they sent him a bunch of undifferentiated tubes and said, here, please use these as part of your experiments. Dr. Goldfarb was an academic and a doctor at the Arizona Heart Institute, and the jury heard how he had his own experiments, and they said, will you include our material along with your work? And he said, yes. And they sent him a bunch of undifferentiated tubes and never said anything about why any of them might work or might not work, because at that time, the evidence showed that Gore had no idea what would work. Now, their brief says that there was a second mailing, and they remark that there was no response in your responsive brief to the single sample that was sorted out as being the best so far. Because the April letter, as is portrayed in that brief and as portrayed here, doesn't say what Gore says. So I will read to the court what it actually says, and I'll explain why it was that the jury was entitled to hold that that and other evidence supported the fact that Cooper was not a joint inventor. In that April letter, which is at JA 41236, Cooper writes to Goldfarb, enclosed Gore-Tex tubes represent the latest attempt to achieve satisfactory patency rates in small artery prosthetics. Patency means open. We have penetrated the walls of the tubes, this is important, with many 50 to 100 micron holes to allow direct tissue ingrowth through the tube walls. Hopefully these pathways will allow rapid, firm attachment of the neo-intima surface. The importance of that letter is that it doesn't say this is the best we have. It doesn't say we hope it will work. What is actually transmitting to Dr. Goldfarb is a failed theory. What happened was is that when Gore contacted Dr. Goldfarb, they had gone through a number of different theories trying to figure out how to make a working graft. Was that the sample that Dr. Goldfarb had planted? Correct. And in fact, what Dr. Goldfarb testified... Then how was it a failure? Apparently that sample that his implant was... The theory was a failure. I apologize, Judge Newman. The theory was a failure because what happened was is that what Gore did was they took a sewing machine and they punched holes in the tube and destroyed the structure. And what Dr. Goldfarb put into the record was grafts with puncture holes were either avoided or the punctured areas were cropped for the specimen that I would use. So what happened was is that they provided him these samples with the reports of the failures of others and the theories of others with these punctures that destroyed the microstructure. He discarded the punctures and said, let me take a look at the microstructures here. And he figured out, based on his own knowledge of what would work in the body, that what was important wasn't making big holes into these things. What he figured out and what the jury heard and credited was is that he took a look at the parts of the tube that weren't punctured and he said, what's important here is internal distance, these hard little nodes of Teflon that if they're too close together will prevent red blood cells from getting through to nourish the scar tissue that grows in and attaches this to the body. So... But this is what I want to understand. The sample that was provided was the sample that was implanted and showed successful results, is that right? Yes. The sample which was provided did show successful results, but not because of anything that Gore contributed. And one of the things that... That's because they perhaps didn't know the reason. They had no idea... But I thought that we have a number of decisions, some of which I think I've criticized, which say that you don't need to know the reason if in fact what you provide has certain properties. You need to know the reason if you're going to contribute to the conception. And as this case said in Vanderbilt, in order to be a joint invention, you have to contribute to the conception. But his court found conception in the Cooper. They found no diligence. But afterwards, at this point, and as Cooper too says... Afterwards, after what? What happens is, here we're at April in the timeline. April they provide this to Dr. Goldfarb, April 73, as well as a bunch of other tubes that they provide to him that were worthless. They then go their separate ways. They're not working together at that point. In June, Cooper has the conception that is recorded in Cooper 1, 154 F3. In July, Goldfarb has the conception of reduction of practice that he gets credit for. At this point, they're not working together. Yeah, but we have a prior conception. There's a prior conception by Cooper. For Gore, by Cooper. Because he didn't reduce it to practice, he lost the interference. He lost the interference because joint inventorship was not an issue in the interference. There's no doubt that joint inventorship was not an issue in the interference. But that being said, the fact that Cooper conceived in June, and the fact that he sent him these tubes in April before anybody conceived, show there was no collaboration as to the conception of the invention. All we have here is a point at which he sends the tubes to Goldfarb, with a letter essentially saying, we've punctured the holes and here's what we've had to date in terms of our theories, which turned out to be wrong, which the jury determined were wrong. And then they go their separate ways. June, Cooper gets a conception. July, Goldfarb gets his conception of reduction of practice. We then have the interference, which determines that Goldfarb is the first to invent. But by April, there is no invention by anybody. And all that Cooper has provided, and is evident from his own testimony, which the jury heard, and which is attached by video here, is when he was asked, why do you think that you were a joint inventor? His answer was, I gave him the tubes. Well, he'd give the tubes to all the doctors that had failed. He'd give tubes to all sorts of people. Explain to me, when the patent office found conception, which is not disputed and was confirmed by this court, you're telling us that it didn't exist? No, I'm not saying that. He conceived of it after the point at which they're talking about for joint inventorship. So when he conceived, it was no longer relevant to a joint inventorship because he conceived of it after the point at which they're talking about. Cooper conceived the counter to the interference after he and Goldfarb had split. Before Goldfarb had any date to which he was entitled, as I recall this court's decision. There's no doubt that Cooper's conception, as far as the Federal Circuit's decisions were, was earlier. But in terms of joint inventorship, what we're looking for is not whether who had a prior conception. What we're talking about is, what was the nature of the collaboration and any contribution to Goldfarb's conception that Cooper contributed? So we know Goldfarb had a conception. Cooper contributed the sample that Goldfarb had handed. And that's all he gave. And this court's holding. The sample is what it's all about? No, it's not. Because without the conception or any contribution to the conception, the sample is worthless. If you gave that same sample to 30 other people, they wouldn't have gotten the idea. And so here, Cooper's contribution, allegedly, to Goldfarb's conception is just giving him the tube with a letter that says, here, we've punched holes in it, and a letter that Goldfarb discounted and got rid of. And that he went off and figured out the invention separately from Cooper. So the fact that Cooper had a separate conception over here is irrelevant to Goldfarb's conception over here. And the only purported contribution that Cooper made out of his own mouth and the facts that the jury heard and the substantial evidence was Cooper gave him the tubes. He didn't give him the tubes, as Cooper, too, without having any knowledge of what was in them. Cooper, too, says he had no appreciation of the fiber length or even of the concept of fiber length or internodal distance. He just gave him the tubes and said, hey, here's some tubes. Here's the latest attempts we've had. And he'll repunch some holes in it. He says this is the best so far. That's it. No, he doesn't say it's the best so far. He does not. I thought that was what you read to us. No, I will read it again. My paraphrase too loose? That's a paraphrase from Gore. He says enclosed vortex tubes represent the latest attempt to achieve satisfactory patency rates in small artery processes. Not the best attempt, just here's the latest in a string of failures. We have penetrated the walls of the tubes with many 50 to 100 micron holes to allow direct tissue ingrowth through the tube walls. Hopefully, these pathways will allow rapid forearm attachment to the neo-intimal surface. But they didn't. They were wrong. This was a wrong theory that Cooper gave him. There was no discussion in that letter about the internodal distance. No, and because no one had a conception of it yet. Was there any other tubes that were sent to other researchers? Yes, there were tubes sent to many, many tens of researchers all at the same time of Gore. The same time that they went to Goldfarb? Correct. And what happened was Gore was... Was that in April also? Before April, after April. Gore was sending tubes out to lots of different doctors who were failing. With the punctures? Some of the punctures. In fact, Dr. Volder, who we've heard about in his affidavit, and I believe, Judge Garza, when you were talking about there being an admission of Matsumoto and Volder not being obviating work, it was Volder's declaration in the patent office where he said, I am firmly of the opinion that having Matsumoto in my hand and Volder in my hand, that Goldfarb's work is not obvious. And then he also goes on to talk about how he was one of the people who was punching holes in the tubes with a sewing machine needle. Again, nobody has ever argued that that was an invention. No one has ever argued that that was right. So what you have here in April, and I apologize to the court because I think Gore has misled the court in some ways by saying that this was the best attempt. What you have here is in April, before either party has a conception, you have Gore providing Goldfarb tubes, much as they provided him before. And here, it's almost like they would've been better off without the letter, because the letter says, here, and here's the latest attempt, and here's our theory. Punch holes through it, and then you'll get tissue ingrowth. Goldfarb discarded that, testified he cut away that portion of the tube, and then he went on to make the discovery that has revolutionized medicine, you know, as part of this invention. Mr. Attorney, I'd like to shift gears to the Matsumoto reference. Sure. What substantial evidence is in the record that might support the jury's conclusion that Matsumoto is not enabled? Okay. Well, what happened was, with Matsumoto, and this is a rare circumstance where we're not looking hypothetically, we have many people of many different skills in relevant arts who had Matsumoto in hand, including Dr. Boulder, who when they had Matsumoto after 1971 and 72, could it make it work? And it's not just a matter of could they have handed it to someone to make it. Could it not make it work? Now, are we talking about efficacy? No, we're talking about... We're talking about the ability to make it. We're talking about the ability to make it. Had people been able to take Matsumoto and say, aha, here's a structure that Matsumoto discloses, it is likely that some of these people would have been able to make a working graft. But instead what happened was that Gore and the doctor... It still sounds like you're conflating these two concepts, making and using, if you will. No, I apologize, Judge, if it sounds like that. What I'm trying to point out... You don't need to apologize. It's just I think that's what you're doing. I'm going to un-conflate it. Because Matsumoto doesn't disclose the structure that Goldfarb came up with, people then could not make it a working graft. It's the very fact that Matsumoto shows that little speck and doesn't tell you anything else to either say it's representative or give you any other indication that this is the structure of a graft or that there's something there. What happened was you ended up with letter after letter from people saying to Matsumoto, Presumably we're using the same thing as you. Dr. Kelly wrote to him. Dr. Eisenman wrote to him. Dr. Campbell said we couldn't determine anything from Matsumoto. So what happened was that because Matsumoto disclosed a fact that, hey, I put this graft into a dog, it worked, and I showed this picture which was not to show the structure but showed we have fibroplasia or tissue ingrowth into these four nodes just to show that this had been a working graft. There's nothing in there for anybody to take Matsumoto and then make a Matsumoto graft. And we have evidence that the jury saw over and over and over again from Gore people, from other independent doctors, from doctors all around who had Matsumoto in hand, including Volder who had his own work plus Matsumoto. And this very factually intensive question was from the jury. And what the jury saw was that nobody could make a graft, whether it's a working graft or a graft that had whatever the structure. No one even knows what the Matsumoto structure is. There's never been anything to indicate that someone could read Matsumoto and then make a graft that meets the elements. Well, when Mr. Denton, one of Gore's witnesses, did he make a statement to the effect that you couldn't figure anything out? That's exactly right. Denton was one of the many people who said you couldn't figure out anything. He was Gore's witness. He was Gore's witness. Shanti Mehta, who was a Gore employee, wrote, We see that Matsumoto reports 100% patency rates, meaning open, but we can't figure out what tubes were used. And this is not a chain of custody issue. This is Gore. Gore made the tube that Matsumoto used and they couldn't look at Matsumoto and figure out how to make the same tube. This wasn't a question. And certainly the jury was entitled to find, as a matter of fact, that this was an issue of chain of custody. It was an issue that Matsumoto doesn't disclose enough. And to this day, I don't think anyone has any reason to believe that Matsumoto, on the whole, discloses a graft with an average internodal distance within the Goldfarb ranges. All we have is that little spec. And we have a lot of evidence talking about how variable tubes were at the time. And we have in the patent itself, Goldfarb, when he talks about an average internodal distance in the spec, he explicitly states average is not a statistical average. It's a nominal or typical thing, which has to be determined by a broad sample. Meaning that even today, when we proved infringement, for example, we had to take samples from around the tube in order to have a broad sample in order to prove an average. You don't sit there and take 10,000 different nodes and average up the distances. You sit there and take the samples. And then you say, we have now an average based on a nominal or typical dimension. Matsumoto clearly does not even comply with that. And it was made at a time when nobody had any conception of the importance of internodal distance or even that it was a parameter worth looking at. And then you have the facts of over and over again. Gore people, Goldfarb, doctors like Dr. Campbell, Denton, saying over and over again, we have this and there's nothing we can do with it. And I think the jury was entitled to credit that when it was determined that A, Matsumoto doesn't disclose the invention, and B, as a result, it didn't enable anybody to practice the invention. Thank you. I have 12 seconds left, so are there any more questions? We'll see. Anything else you need to tell us? I don't think so. Thank you. Mr. Toronto. Thank you. Joint inventorship. I read from Cooper 2, the letter to Goldfarb accompanying the lot material, that's the April letter. In that letter, Cooper described the material as representing the latest attempt to achieve satisfactory patency rates in small artery prosthetics, indicating that he expected the material to be suitable as a vascular graft. That piece of inurement went in Cooper's favor. Cooper lost inurement on other grounds, not because he was saying anything in that letter other than, I think this is the best thing I have. And indeed, he attached the brand new, sharp results, which were results on the three-structure experiment, the coarse, the medium, and the fine, showing the coarse to be the best. Mr. Toronto, is there any collaboration after the April letter? Oh, yes. I'm sorry, let me read from 9377 of the appendix. This is Dr. Goldfarb testifying. And what was your interaction during this time period, in sort of late spring 1973 with Mr. Denton? Answer from Goldfarb, Mr. Denton would pay visits to the lab to see what type of research we were doing and to take back with him the knowledge of this to the Gore Company. I guess he was sort of a messenger in a way and coordinated in that way our efforts with feedback to the Gore Company. Late spring? Could that be April? Yes. Maybe later than that. Is there any indication? Is there a when? Yes. For example, the reason we know that the harvest took place on June 13th is that the appendix contains Denton's trip report from his visit to the Arizona Heart Institute. And he actually watched Dr. Goldfarb take that one, that explant, the grafts from the dog. He was there all of the time. There was constant communication. Right after that... That was Denton. Denton was working for Cooper. He was the go-between. He was the courier. Yes. To use a current word. Yes. Exactly. So there is... And then of course the collaboration continued. Gore created and partially funded the 64 graft experiment when after the recognition by Goldfarb it was perfectly clear that nobody could make an actually humanly usable graft and a lot of work needed to be done. And Gore through Denton and Netta, the statistician, created a statistically sound experimental protocol and Dr. Goldfarb with Gore funding undertook some of that. So I guess the final thing I will say about the joint inventorship, the needle holes have got to be a red herring. If Goldfarb wasn't looking at the actual microstructure of the graft but was looking at needle holes, he didn't have a reduction to practice and the whole interference dissolves. The needle holes were just some extra benefit that Cooper thought it might have just recently reintroduced. That doesn't take away from the fact that there was a year and a half worth of effort to get to the actual microstructure that he sent to Goldfarb which Goldfarb implanted, took slides of, said, oh, under a microscope I now notice something. Can I say one word about Matsumoto before I sit down? I think it is right that on enablement we heard absolutely nothing from Mr. Cherney except discussion about efficacy which is not the issue. There is simply no evidence that anybody had that lacked the ability to make a Matsumoto graft. That is a graft containing what now even Dr. Goldfarb and barred by its stipulation in the record acknowledges is shown by the Matsumoto article. They expressly acknowledge, we don't dispute it shows an internodal distance.  I agree with what my own expert, Dr. Schoen, told the PTO about 50 microns. It shows that right in the picture because you know the size of the nuclei of the fibroblasts and you can look at it and see it right there. So could anybody make it? The patent says once you know what the specifications are you can make it. You cannot demand from prior art any more enablement than the patent itself provides. Any more questions? Thank you very much. Any more questions? Thank you Mr. Toronto and Mr. Cherney. The case is taken.